UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RONALD H. BENNETT | CIVIL ACTION |
| v. | NO. 13-5816 |
| TRINITY MARINE PRODUCTS, INC. | SECTION "F" |

<u>ORDER AND REASONS</u>

Before the Court is Trinity Marine Products, Inc.'s moton for summary judgment. For the reasons that follow, the motion is GRANTED in part and DENIED in part.

**Background**

This employment discrimination lawsuit arises out of the plaintiff's claims that, upon his return from taking medical leave after suffering an aortic aneurysm, his former employer unlawfully failed to reinstate him to his prior position and then fired him in retaliation for exercising his rights under the Family and Medical Leave Act.

Trinity Marine Products, Inc. manufactures barges used to transport cargo on U.S. inland waterways. Ronald H. Bennett began working as a burner for Trinity at Plant 1038 in Madisonville, Louisiana in 1979. He gradually worked his way up to a management

position.[1]  Bennett was promoted to Production Manager in 2011 by then-Plant Superintendent Sam Naramore, who at that time was also Bennett's supervisor.[2]  In particular, Bennett was tasked with managing the pipe and testing departments; he was responsible for overseeing welders and pipe fitters. In early 2012 Bennett received a "meets expectations" performance rating on his 2011 performance evaluation from Naramore.  In September 2012 Rick Badon became the new Plant Manager. Shortly thereafter, Badon demoted Naramore to a Production Manager position due to performance-related issues.

After a company picnic on October 22, 2012 Bennett suffered an aortic aneurysm.  As a result, he took leave authorized by the

---

[1]Bennett had a break in his employment with Trinity from 1982, when the yard shut down, until 1991.  In 1991 Bennett returned to work for Trinity as a plasma operator or burner.
    In June 2011, Bennett worked as a Machine Operator Lead, and he was promoted to supervisor.  In November 2011, Bennett was promoted to Production Manager in Trinity's pipe department.

[2]Periodically throughout his employment, before he was promoted to a manager, Bennett was written up or counseled for performance issues and company policy violations:
• on May 2, 2000 Bennett received a written warning for carelessness/safety violations;
• in February 2002 Bennett received a written warning for poor performance;
• in January 2005 Bennett was counseled for a layout error and warned that demotion could result if errors continued;
• in June 2005 Bennett received a written warning notice for "poor supervisor performance" and, consequently, was reclassified from a supervisor to a lead position;
• in August 2006 Bennett received a written warning for a safety violation.
Except for the August 2006 warning, Bennett either does not recall or disputes the allegations underlying each of these employment notices.

Family and Medical Leave Act, starting at the end of October 2012. While he was out on FMLA leave, Tim Gay (another Production Manager) took over Bennett's responsibilities including managing the pipe and testing departments. In fact, during this time that Bennett was on leave, Plant Manager Badon conducted a reorganization in which several production managers were re-assigned to manage different departments.[3]

A few months later, Bennett's treating doctor released him to return to work without restrictions; Bennett returned to Trinity in February 2013. Bennett resumed his prior position as Production Manager, and his pay, benefits, and overall management duties remained the same as those prior to his FMLA leave. However, Tim Gay continued to oversee Bennett's previously-assigned department, the pipe department and, in part, the testing department. As Production Manager, Bennett continued to bear responsibility for managing a 28-man crew, developing budgets, and overseeing completion of the barges for delivery; he was, however, tasked with overseeing different departments, the cleaning and painting departments, although he continued to manage the hydro and testing

---

[3]This re-organization resulted in the following reassignments: (1) Production Manager Mac Cook, who previously managed the Erection Station, was assigned to manage Shops #2 and #3; (2) Production Manager Tim Gay, who previously managed Shops #2 and #3, was assigned to manage the pipe department and the Erection Station; and (3) Production Manager Joey Hoover, who previously managed the Trucks and Sterns department, was assigned to manage Erection Station #2.

departments.[4]

After Bennett returned from leave (after Deese replaced Naramore as Plant Superintendent), Deese counseled Bennett regarding his job performance.[5] In particular, Deese complained that barges were not being sufficiently cleaned, were not being completed for on-time delivery, and that the proper procedures for hydro testing were not being followed. Bennett suggests that he was not disciplined for these purported performance deficiencies, and explains away these complaints as examples of him being targeted for discipline for issues that were not his fault, including because members of his crew were being reassigned to work for other Production Managers, compromising Bennett's department's ability to accomplish its tasks.[6]

In addition to these purported performance deficiencies, Bennett was also reprimanded for failing to timely submit written evaluations for his direct reports; submitting an evaluation for one of his direct reports which contained grammatical errors and an

---

[4]Bennett continued to have some responsibility over the testing department.

[5]In February 2013 Badon replaced Naramore with Kevin Deese as the new Plant Superintendent; Deese reported directly to Badon. As Plant Superintendent, Deese directly supervised Production Managers like Bennett and Naramore.

[6]As for Bennett's alleged failure to submit a written plan outlining the proper procedures for hydro testing, Bennett argues that the plan was unnecessary but that, in any event, Deese proceeded to humiliate him due to the poor grammatical skills exhibited in the partial plan he drafted.

allegedly improper comment regarding his subordinate's weight;
refusing to revise the evaluation and correct the errors; showing
a lack of professionalism at business meetings (taking personal
calls and checking facebook during meetings).  Bennett does not
deny that he was reprimanded for these issues.  But he disputes the
merits of the underlying complaints, and explains: according to the
email reminding him to submit his performance evaluations, other
individuals had more evaluations outstanding than Bennett; the
comment in his evaluation regarding his subordinate's weight was
not improper because the workers work in confined spaces; managers
regularly use their cell phones on the job and Bennett used his
cell phone for proper purposes (to communicate with his crew) and
was never disciplined.

On June 26, 2013 Bennett was issued an Employee Action Plan,
which listed Bennett's purported performance deficiencies, noted
his failure to utilize his crew efficiently, and cautioned "we are
placing you on an action plan, we MUST see immediate improvement in
key areas [outlined in the plan]."  Bennett admits to receiving the
Action Plan, but again disputes his responsibility for the
purported deficiencies it outlines.

Early on the morning of July 16, 2013, one of Bennett's direct
reports, Roy Priser, was scheduled to work, but called in sick,
stating that he had a kidney stone. (Bennett does not dispute that
Priser was scheduled to work but called in sick.)  Bennett entered

a payroll code of "No Work - Not Dispatched", a code which indicated that Priser was not on the July 16 schedule; as such, the day would not be counted against Priser in terms of bonus consideration. According to formal company policy, this was a falsification related to payroll or time-keeping, which is a major infraction and first-time terminable offense.[7]

Two days later on July 18 Bennett was placed on suspension pending investigation. Four days later on July 22 Trinity terminated Bennett's employment based on his poor performance and his failure to improve under the terms of the Employee Action

---

[7]For his part, Bennett responds that informal Trinity policy sanctioned his use of the No Work – Not Dispatched code under the circumstances. Bennett testified:

> these guys are working six, seven days a week, no time off, 12, 13 hours a day, trying to get these barges on the water ready for inspection and sales. And when they ask for a day off or they call in and say, "Look, I ain't going to make it," I say "I put you in a no work scheduled day, no dispatch."

When asked "what does company policy say about that?" Bennett responded "They told me I could do that." Bennett explained, by way of sworn statement issued after his deposition, that Dennis Brewster, Sam Naramore, and Ben McHughes all told him that, if an employee requested time off, he should mark the employee as not being dispatched. On the other hand, Priser testified:

> Q. Are you aware of any reason why Mr. Bennett would have coded you as no work, not dispatched?
> A. [F]rom time to time, if we, you know, didn't have any work, they would – they would code us a no workday and that way the time off didn't count against you.
> Q. Would that have applied in that particular situation?
> A. No, ma'am.

6

Plan.[8] Rick Badon made the decision to fire Bennett based on the information and documents provided by Kevin Deese and HR Manager Diane Boudreaux.  Trinity did not hire anyone in place of Bennet; rather, Tim Gay subsumed Bennett's duties and took over managing the departments previously managed by Bennett.[9]

On September 12, 2013 Bennett sued Trinity, alleging claims under the Family Medical Leave Act as well as state law-based disability and age discrimination claims. Trinity now seeks summary judgment in its favor dismissing all claims.

## I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury

---

[8]Bennett says that this stated reason for termination is pretextual. While Bennett was still employed at Trinity, Naramore also took FMLA leave starting in May 2013, and he returned as a Production Manager in August 2013.  In April 2014 Naramore took a second FMLA leave.  To date, Naramore remains employed by Trinity as a Production Manager.

[9]Bennett submits that, once he was fired, Trinity outsourced the cleaning responsibilities as it had before he took leave and, thus, no Trinity Production Manager was responsible for managing that department.

could return a verdict for the non-moving party." <u>Anderson v.</u> <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>See</u> <u>id</u>. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. <u>Id</u>. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. <u>See</u> <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. <u>Id</u>. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. <u>Martin v.</u> <u>John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

## II.
### A.

The Family and Medical Leave Act of 1993 entitles eligible employees to take reasonable leave for personal or family medical

reasons. 28 U.S.C. § 2601(b)(2).[10] The FMLA creates distinct prescriptive and proscriptive rights: first, the FMLA protects employees from interference with their entitlements under the Act[11] and, second, it protects them from discrimination or retaliation for exercising their right to take leave under the Act.[12] See <u>Haley v. Alliance Compressor, LLC</u>, 391 F.3d 644, 649 (5th Cir. 2004).

An employee pursuing an entitlement or interference claim under the first provision of the FMLA may challenge the employer's failure to return him to the position he held before taking leave. Section 2614 confers on eligible employees this substantive right to be returned to the same or equivalent position:

> [A]ny eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave--
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
> (B) to be restored to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.

---

[10]The Act guarantees eligible employees to take up to 12 weeks of leave from work in any 12 month period in the event that, for example, the employee requires treatment for a "serious health condition." 29 U.S.C. § 2612(a)(1)(D).

[11]29 U.S.C. § 2615(a)(1)(substantive entitlement or interference provision: "It shall be unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.").

[12]29 U.S.C. § 2615(a)(2)(discrimination or retaliation provision: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any such practice made unlawful by this subchapter.").

29 U.S.C. § 2614(a). Of course, this entitlement is not without limits: "[a]n employee is not entitled to 'any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not take the leave.'" <u>Silva v. City of Hidalgo, Tex.</u>, --- Fed.Appx. ---, 2014 WL 3511685, at *3 (5th Cir. Jul. 17, 2014)(citations omitted); 29 U.S.C. 2614(a)(3)(noting limitation on restored employee entitlements). Unlike in discrimination cases, "[a]n employer must honor entitlements, and cannot defend by arguing that it treated all employees identically." <u>Mauder v. Metropolitan Transit Authority of Harris County, Tex.</u>, 446 F.3d 574, 580 (5th Cir. 2006)(citing <u>Nero v. Indus. Molding Corp.</u>, 167 F.3d 921, 927 (5th Cir. 1999)). Furthermore, unlike discrimination or retaliation claims, entitlement claims are resolved without regard to the employer's intent. <u>See Nero</u>, 167 F.3d at 927 ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").[13]

---

[13]"[C]laims that arise from the deprivation of a FMLA entitlement do not require a showing of discriminatory intent, whereas claims that arise from alleged retaliation for an employee's exercise of FMLA rights *do*." <u>Cuellar v. Keppel Amfels, LLC</u>, 731 F.3d 342, 349 (5th Cir. 2013)(Elrod, J., specially concurring to address "the issue on which the district court ruled and that the parties extensively briefed on appeal[:] whether a plaintiff must prove that the defendant acted with discriminatory intent to succeed on a claim for 'interference' with an FMLA entitlement")(emphasis in original).

When a plaintiff invokes the second, proscriptive FMLA
provision -- the right to be free from discrimination or
retaliation for having exercised the right to take FMLA leave --
absent direct evidence of discrimination or retaliation, courts
apply the familiar McDonnell Douglas burden-shifting regime applied
in the Title VII anti-discrimination and anti-retaliation context.
See Hunt v. Rapides Healthcare System, LLC, 277 F.3d 757, 768 (5th
Cir. 2001). According to McDonnell Douglas Corp. v. Green, 411
U.S. 792 (1973), the plaintiff must first make a prima facie case,
then the burden shifts to the defendant to articulate a legitimate
non-discriminatory or non-retaliatory reason for the adverse
employment action, and then if the defendant satisfies that burden
of production, then the burden shifts back to the plaintiff, who
must prove by a preponderance of the evidence that the proffered
reason is pretextual. To make a prima facie case of discrimination
or retaliation under the FMLA, the plaintiff must show that: (1) he
was protected under the FMLA; (2) he suffered an adverse employment
action; and either (3a) he was treated less favorably than a
similarly situated employee who had not requested FMLA leave; or
(3b) that the adverse employment action was made because he took
FMLA leave. Hunt, 277 F.3d at 768.

*B.*

Trinity seeks judgment as a matter of law dismissing Mr.
Bennett's FMLA entitlement and retaliation claims.

1.  Entitlement Claim, 29 U.S.C. § 2615(a)(1)

Insofar as the plaintiff presents an FMLA entitlement claim, the Court's task is to determine whether or not Bennett was returned to an equivalent position once he returned from medical leave.  The plaintiff contends that being put in charge of the paint and cleaning crew departments was a fundamentally different assignment than being in charge of the pipe department. Trinity counters that Bennett was returned to an equivalent position, Production Manager, when he returned from medical leave, and that his new departmental assignment did not violate FMLA where, as here, it was part of a reorganization in which several other production managers were assigned to manage new departments.  The Court agrees.

To succeed on his entitlement theory, Bennett must show that Trinity failed to restore him "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1)(B).  To be equivalent, the Department of Labor regulations require that the employee's new position must be

> one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215(a).  However, the employer's obligation to reinstate eligible employees to "virtually identical" positions

12

"does not extend to *de minimis*, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

Viewed in the light most favorable to Bennett, the summary judgment record shows, at most, *de minimis* changes to his position at Trinity. Upon his return from leave, Bennett kept his title; he remained a Production Manager. As before, he was still responsible for the testing and hydro departments, as well as overseeing barge delivery. But, in place of managing the pipe department, Bennett was tasked with managing the paint and cleaning departments. Although Bennett disliked being newly assigned to manage the paint and cleaning departments, he does not dispute that his overall management duties remained the same: he continued to be responsible for overseeing direct reports, developing budgets, overseeing barge delivery, testing vessels. Likewise, his pay and his benefits were not changed.[14] Trinity points out that Bennett concedes that his overall pre-leave duties involved "cosmetic work[,] mak[ing] sure everything was tidy and done and ready and sold". That his post-leave responsibilities included overseeing "painting, testing, and finishing barges at the end of the assembly line" seem substantially similar responsibilities, or at least only negligibly different. On this record, the plaintiff has failed to raise a

_____

[14]In his opposition papers, Bennett suggests that his hours and responsibilities changed when he returned from leave. But he fails to point to any support in the record. And the portions of his own deposition testimony cited by the defendants belie Bennett's suggestion.

genuine dispute as to the material fact regarding the equivalency of his pre-leave and post-leave Production Manager position at Trinity.

Even if the plaintiff somehow persuaded the Court that he was not returned to an equivalent position, the plaintiff nevertheless fails to establish that Trinity's decision to assign Bennett to manage a different department violated his right to reinstatement under the FMLA. Critically, "the reinstatement privilege is not unlimited." Forbes v. Unit Texas Drilling, L.L.C., 526 Fed.Appx. 376, 380 (5th Cir. 2013). In fact, 29 U.S.C. § 2614(a)(3) makes clear that an employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. 2614(a)(3)(B). The defendant contends, and the record confirms, that the decision to assign Bennett different departments to manage was part of an overall reorganization that occurred when Bennett was out on leave. That other Trinity Production Managers were likewise reassigned to manage departments that they had not previously managed, pursuant to the overall reorganization effort orchestrated by Rick Badon, undermines Bennett's argument that he was categorically entitled to be restored to Production Manager over his preferred departments only. Bennett fails to identify any record evidence that would support a finding that, had he not taken leave, he would have been

entitled to remain Production Manager over the pipe department in spite of plant-wide reorganization. Trinity is entitled to judgment as a matter of law on Bennett's entitlement claim.

2. Retaliation Claim, 29 U.S.C. § 2615(a)(2)

Bennett also advances a discrimination or retaliation claim. Bennett insists that his supervisor sabotaged his ability to manage the cleaning crew, which allowed Trinity to "paper his file" with exaggerated performance issues, after which time Trinity suspended him for following unofficial policy and, ultimately, terminated him under the guise of bogus performance issues. He contends that he has proved his prima facie case, and that he has at least raised a fact issue concerning whether Trinity's stated reason for terminating his employment was pretextual. Trinity counters that the plaintiff cannot establish the third element of his prima facie case of FMLA discrimination or retaliation (that he was fired because of his leave; or disparate treatment) and that, even if he can, there is no evidence in the record of pretext. Finding fact issues remain in dispute, the Court disagrees.

(a) The third element of the prima facie case

The parties agree that, where there is no direct evidence of discrimination or retaliation, the Court applies the McDonnell Douglas burden-shifting framework.[15] Here, there is no dispute as

---

[15]Bennett alludes to direct evidence that Bennett was targeted for termination while he was on FMLA leave. In particular, he suggests that former employee Grady Melton testified

to the first two elements of Bennett's prima facie case: Bennett
was protected under the FMLA and he suffered an adverse employment
action when his employment was terminated.[16] Trinity does, however,
dispute the plaintiff's ability to prove the third element, either
that he was treated less favorably than a similarly situated

---

that he talked to several managers, including Rick Badon, about
Bennett's condition while Bennett was out on leave, and that Badon
told Melton that they would have to "purge" Bennett when he
returned from leave. At best, the plaintiff embellishes the link
between the "purge" comment and his FMLA leave; when placed in
context, the portions of the record cited by Bennett are not so
sinister as to directly prove his retaliation claim. Indeed, Melton
testified that he himself expressed concern with Bennett's physical
abilities once Bennett returned; he states that he was told by
Badon, in response to his concerns, "I guess we'll just have to
purge him then." Badon told Melton "if [Bennett] can't [do the
job] then we'll just get rid of him." However, later placing these
comments by Badon in context, Melton conceded that the comments
were made "in the context of if Mr. Bennett didn't do his job", and
that Badon made similar comments with respect to other Production
Managers as well. In any event, like Trinity, Bennett urges the
Court to apply the familiar burden-shifting framework; on this
record, Bennett wisely seeks to satisfy his prima facie showing
through circumstantial evidence of disparate treatment, rather than
attempting to anchor his retaliation claim solely to so-called
direct proof of discriminatory or retaliatory animus. It is also
notable that Bennett does not urge application of the mixed-motive
framework. The Fifth Circuit has not determined whether the Supreme
Court's analytical approach in University of Texas Southwestern
Medical Center v. Nassar, U.S. , 133 S.Ct. 2517 (2013) and Gross v.
FBL Financial Services, Inc., 557 U.S. 167 (2009) -- which have
limited the applicability of the mixed-motive framework in Title
VII and ADEA claims -- applies to FMLA retaliation claims and, if
so, whether it requires a plaintiff to prove but-for causation.
See Ion v. Chevron USA, Inc., 731 F.3d 379, 389-90 (5th Cir. 2013).
Nor must this Court decide, as neither party urges application of
the mixed-motive framework to the summary judgment record.

    [16]Bennett also contends that he suffered an additional,
but related, adverse employment action: that he was targeted for
termination and set up to fail in being assigned the cleaning crew.

employee that had not requested leave, or that he was (set up to
fail and ultimately) fired because he requested and took leave.
Trinity downplays those portions of the record that support
Bennett.

Viewing the record in the light most favorable to Benett,
there is a factual controversy that precludes summary judgment in
Trinity's favor on this third element of Bennett's prima facie
case. Trinity points out, and the record supports, that more than
one Production Manager was assigned a new or different department
as part of a reorganization. But Bennett finds support in the
record for his theory underlying his prima facie case: that while
he was out on leave, there was talk among supervisors that he would
be fired if he did not perform up to par upon his return from
leave; that he was the Production Manager saddled with managing a
cleaning crew; that cleaning (before he took leave and after he was
fired) had been outsourced and anyone responsible for this
department was being set up to fail;[17] that while he was in charge
of the cleaning department, he was written up for poor performance,
in spite of the fact that his crew was constantly being reassigned
such that the department was understaffed, compromising its ability

---

[17]Notably, and contrary to Trinity's argument, Bennett's
self-serving testimony is not the only support for this theory;
Melton and other Trinity employees likewise testified on this issue
in support of Bennett. Although Trinity insinuates that these
other employees' credibility might be undermined by the fact that
they no longer work for Trinity, the Court must refrain from making
any credibility determinations.

to succeed; that he was fired several months after returning from leave. The Court will not weigh this evidence or make credibility determinations on summary judgment.

   (b)  Articulating a legitimate reason for termination

   Having found a factual controversy exists precluding summary judgment on Bennett's prima facie case, the Court proceeds under the <u>McDonnell Douglas</u> framework; a presumption of discrimination arises and the burden shifts to Trinity to articulate a legitimate reason for the adverse employment action.  Trinity has done so.  Indeed, there is no credible dispute that Trinity has carried its burden of production in pointing to the Employee Action Plan issued to Bennett and its position that he failed to improve his poor performance before being fired.  Although Bennett disputes the veracity of Trinity's stated reasons for firing him, the reasons are facially legitimate, non-discriminatory or non-retaliatory reasons for terminating employment.

   (c)  Pretext

   Having met its burden of production, any presumption of discrimination/retaliation has been rebutted, and the burden shifts back to Bennett to offer evidence sufficient to identify a material fact concerning whether or not Trinity's articulated reason is but a pretext for discrimination.  On this record, Bennett has done so. Bennett does not simply concede that he had performance issues upon his return from FMLA leave, but, rather, he maintains that the

articulated reasons for firing him are false or fabricated and proximate to his return from leave.[18]   He submits that Trinity trumped up reasons for firing him, that he did not poorly perform his job duties (and that, if he did, it was due to being assigned to the cleaning department); if the jury credits Bennett's theory of the evidence, then the jury may disbelieve Trinity's stated reasons for firing him.  Trinity counters that Bennett's subjective beliefs are insufficient to prove pretext.  The jury could choose to disbelieve Trinity, or it could disbelieve Bennett.  That seems rather obvious.   Simply put, the evidence is conflicting. Presented with a fact-intensive dispute, the Court is persuaded that summary judgment is not appropriate on this record. Considering the same evidence outlined above, and that plaintiff was on medical leave while supervisors allegedly discussed firing him if he did not perform up to standards, plaintiff at the least makes a prima facie case under the FMLA, and a material factual dispute remains regarding whether defendant's proffered reason is pretext.   On this record, it is the province of the jury to probe whether an employer's decision was made with discriminatory motive.

---

[18]The Court notes that, while Bennett was suspended for allegedly improper payroll coding, he disputes that he acted contrary to policy.  And, although a dischargeable offense, Trinity does not offer up the payroll coding infraction as the reason it terminated his employment.

III.

Trinity also seeks judgment as a matter of law dismissing the plaintiff's age and disability discrimination claims. Insofar as the plaintiff alleges state law-based age and disability discrimination claims, Trinity is entitled to summary judgment because the record shows that the plaintiff has failed to satisfy his pre-litigation obligations under La.R.S. § 23:302(C).[19] Likewise, Trinity submits, and the plaintiff does not contest, that insofar as the plaintiff intended to pursue an ADEA or ADA claim, no EEOC Charge alleging either age or disability discrimination was ever filed.[20] The Court lacks subject matter jurisdiction over any ADEA or ADA claims the plaintiff had hoped to pursue. See Pacheco v. Mineta, 448 F.3d 783, 795 (5th Cir. 2006). Finding no support for exhaustion in the record, the plaintiff's age and disability discrimination claims, whether based in state or federal law, must be dismissed.

Accordingly, the defendant's motion for summary judgment is GRANTED in part and DENIED in part. All of the plaintiff's claims are dismissed, except for his FMLA discrimination/retaliation

---

[19]The plaintiff fails to advance any argument concerning any state law claims. The Court considers these claims abandoned.

[20]The plaintiff's complaint alleges a disability claim under Louisiana's anti-discrimination statute, but does not mention the ADA. But the plaintiff's opposition papers argue that he has at least raised disputed fact issues concerning an ADA claim. Regardless, the plaintiff nowhere submits evidence showing that he exhausted his pre-suit EEOC remedies.

claim.

New Orleans, Louisiana, September 18, 2014

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE